UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| SUSAN WADAS,<br><br>    Plaintiff,<br><br>  vs.<br><br>DELTA AIR LINES, INC., DOE<br>DEFENDANTS 1-10,<br><br>    Defendants. | CIV. NO. 18-00312 LEK-KJM |

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Delta Air Lines, Inc.'s ("Delta" or "Defendant") Motion for Summary Judgment ("Motion"), filed on January 22, 2020.[1] [Dkt. no. 77.] Plaintiff Susan Wadas ("Plaintiff") filed her memorandum in opposition on July 10, 2020, and Defendant filed its reply in opposition on July 17, 2020. [Dkt. nos. 98, 102.] This matter came on for hearing on July 31, 2020. On August 24, 2020, Plaintiff filed a supplemental memorandum in opposition ("Plaintiff's Supplement"), and Defendant filed its response to Plaintiff's supplemental memorandum ("Defendant's Supplement") on August 31,

---

[1] On March 18, 2020, the Motion was deemed withdrawn without prejudice to the renewal of the Motion with a one-page notice. [Minute Order (dkt. no. 86).] Defendant filed its notice of renewal on June 22, 2020. [Dkt. no. 92.]

2020.[2]  [Dkt. nos. 113, 116.]  On October 22, 2020, an entering

order was issued informing the parties of this Court's rulings

on the Motion.  [Dkt. no. 119.]  This Order supersedes that

entering order.  For the reasons set forth below, Defendant's

Motion is granted, and summary judgment is hereby granted in

favor of Defendant as to all of Plaintiff's claims in this case.

**BACKGROUND**

I.   **Relevant Facts**

Plaintiff's employment with Delta began in 2008.

[Def.'s Concise Statement of Facts in Supp. of Motion for

Summary Judgment ("Def.'s CSOF"), filed 1/22/20 (dkt. no. 78),

at ¶ 4; Pltf.'s concise statement ("Pltf.'s CSOF"), filed

7/10/20 (dkt. no. 99), at Response ¶ 4 (stating Def.'s ¶ 4 is

undisputed).]  Plaintiff, an aircraft mechanic, began a Delta

internship in Fall 2008, in Atlanta.  [Pltf.'s CSOF, Decl. of

Susan Wadas ("Pltf. Decl.") at ¶¶ 4-5.]  Plaintiff bid on an

open position in Honolulu for an aircraft mechanic position on

the "international line," *i.e.*, the group of mechanics who

worked on aircraft that flew internationally.  [Def.'s CSOF,

Decl. of Richard M. Rand ("Rand Motion Decl."), Exh. A (excerpts

---

[2] At all times relevant to the Motion, Plaintiff was
represented by counsel.  However, on December 10, 2020,
Plaintiff's counsel filed a motion to withdraw, and the
magistrate judge orally granted the motion at a hearing on
December 16, 2020.  [Dkt. nos. 125, 130.]  Plaintiff is now
proceeding *pro se*.

of trans. of Pltf.'s 2/8/19 depo. ("Pltf. Depo.")) at 26-27.]
On August 1, 2009, she was informed that she was selected for
the position, but Delta wanted her to go through more training
before she went to Honolulu.[3]  [Id. at 27.]  In August and
September 2009, Plaintiff "was in 767 school," and she "was in
757 school" in either October or November 2009.  [Id. at 28.]

Plaintiff states that, when she was still in Atlanta
training for her transfer to Honolulu, she was told by Tim
Donahue, someone from Honolulu who was in her training class,
that the male mechanics were not happy about her transfer.  She
reported it by email to someone named Paul,[4] but he said what
Donahue told her was not true, and she did not have to worry
about it.  Plaintiff no longer has that email because it was
thrown away when her work locker was cleared out.  [Pltf.'s
CSOF, Decl. of Lanson K. Kupau ("Kupau Decl."), Exh. A (Pltf.
Depo.) at 32-34.]  When she came to Honolulu, Plaintiff heard
from multiple mechanics that Paul Fugere had said women did not
belong on the maintenance line.  Plaintiff did not believe she
heard that before she came to Honolulu, and she never asked

---

[3] Plaintiff makes an argument regarding her prior non-
selection for similar positions, see Pltf.'s CSOF at Response
¶ 5, but her claims in this case are not based on those
selection processes.
[4] This apparently refers to Paul Fugere, the manager of
Delta's Honolulu station at that time.  [Pltf.'s CSOF at ¶ 6.]
Carter subsequently assumed that position.  [Id. at ¶ 9.]

Fugere about the statement.  [Id. at 65-66.]  Plaintiff did not know whether the statement was directed to her specifically or was about women in general.  [Id. at 70-71.]  Plaintiff also stated that, one summer, Fugere called her into his office to tell her some of the men complained that she had body odor. [Id. at 72.]  Plaintiff also relies on a January 2011 email chain between Fugere and Resil Lasam, the "Duty Manager – ALT Intl Line Mtc."  See Kupau Decl., Exh. R (emails from to January 6 to 12, 2011).  Lasam stated Plaintiff "did not officially belong to us," and Fugere responded "I wish she didn't belong to me either."  [Id. at DELTA_000001379.]  Lasam stated, "I know how you feel."  [Id.]

        "In 2011, Carter offered Plaintiff the 'honorable' position of Safety Chair and invited her to attend a managers' meeting in Portland, which was a 'very positive thing' for Plaintiff."  [Def.'s CSOF at ¶ 17; Pltf.'s CSOF at Response ¶ 17-19 (stating Defendant's ¶¶ 17 to 19 are undisputed).[5]] There, Plaintiff met Jack LaPalm, Delta's Station Manager in Portland, and he told her he would help her become a lead.  In addition, in February 2012, Carter sent Plaintiff to obtain her

---

[5] In some instances, Plaintiff has one paragraph responding to multiple paragraphs in Defendant's CSOF.  See, e.g., Pltf.'s CSOF at Response ¶ 6-9, ¶ 17-19.

certification to service Boeing 747s.  [Def.'s CSOF at ¶¶ 18-19;

Pltf.'s CSOF at Response ¶ 17-19.]

A.   **Issues with Justin Keller**

During her employment, Plaintiff experienced multiple

difficulties with Justin Keller ("Keller"), an aircraft

technician.   The parties agree that:

-"In August 2010, . . . Keller complained about Plaintiff . . .
     driving fast while talking on the phone, and Plaintiff
     complained soon after that Keller made extended stops,
     drove too slowly, had 'psychological problems,' and lacked
     'full mental capabilities.'"  [Def.'s CSOF at ¶ 6; Pltf.'s
     CSOF at Response ¶ 6-9 (stating Defendant's ¶¶ 6 to 9 are
     "Undisputed").]

-In January 2011, Plaintiff complained that Keller assigned her
     to repair an aircraft toilet.  Although such repairs were
     within Plaintiff's job duties, she had never performed the
     repair prior to that instance.  During the investigation
     conducted by Human Resources ("HR") Manager, Lisa Todd
     ("Todd"), Plaintiff complained that the toilet which Keller
     assigned her to replace was on an aircraft that she was not
     assigned to, and she was left alone, even though she did
     not know how to perform the repair.  [Def.'s CSOF at ¶¶ 7-
     9; Pltf.'s CSOF at Response ¶ 6-9.]

-Todd ultimately concluded that there was insufficient evidence
     to support Plaintiff's complaint that Keller treated
     Plaintiff unfairly because of Plaintiff's gender.  [Def.'s
     CSOF at ¶ 13; Pltf.'s CSOF at Response ¶ 13.]

1.   **Toilet Repair Incident**

In the statement he submitted to Todd, Keller reported

having "problems with [Plaintiff] understanding that were [sic]

all a team and that each plane is actually everybody's plane."

[Rand Motion Decl., Exh. F (excerpts of trans. of Todd's

10/23/19 depo. ("Todd Depo.")), Exh. 15 (email dated 1/10/11

from Todd to Mindette Fredrikson transmitting written statements) at DELTA_000001121.[6]]  According to Keller, he assigned Plaintiff to the toilet repair because he "believed that it was a good opportunity for her to gain some experience," since she was "new to maintenance" and "everyone else on duty ha[d] over 5 years of service with Delta."[7]  [Id. at DELTA_000001122.]  According to Keller, he did several things to assist Plaintiff with the repair, including pulling paperwork for her to follow, removing the shroud, answering her questions, and arranging for the delivery of the replacement toilet to the aircraft.  In addition to the period when Plaintiff knew Keller was in the aircraft, there was also a lengthy period of time when Keller was sitting near the lavatory but could not be seen by Plaintiff from inside.  [Id. at DELTA_000001123-25.]  Keller acknowledged a personality conflict and friction between him and Plaintiff, but he denied that gender was a factor.[8]  [Id. at DELTA_000001129.]  Five months earlier, Plaintiff told Keller

---

[6] DELTA_000001121 to DELTA_000001128 is the "Statement Concerning Susan Wadas," dated January 5, 2011 by Keller, and DELTA_000001129 is an email dated January 7, 2011 from Keller to Todd, adding more details to his statement.

[7] Keller was the temporary lead or technician in charge at that time.  [Rand Motion Decl., Exh. F (Todd Depo.), Exh. 15 at DELTA_000001122.]

[8] Plaintiff argues this shows Keller was aware that she felt she was being discriminated against.  [Pltf.'s CSOF at Responsive ¶ 11.]

she thought she was not welcome at the station because she was a woman, but Keller told her he did not think that was true. Keller did not realize until January 6, 2011 that Plaintiff made the complaint about the lavatory assignment because she believed the assignment was the result of differential treatment based on her gender.  [Id.]

During her deposition, Todd testified that, in connection with one of the investigations into Plaintiff's complaints regarding Keller, Plaintiff identified her supervisor, Alex Pacheco ("Pacheco"), and someone named "Jake" as potential witnesses who could support her complaints.  [Rand Motion Decl., Exh. F (Todd Depo.) at 135-36.]  According to Todd, she spoke to Pacheco, and he believed that Plaintiff was being harassed or discriminated against, but he had not witnessed any specific incidents.  [Id. at 136-37.]  Pacheco told Todd that Plaintiff was perceived as lacking skills and others seemed unwilling to work with her because she was a woman.  [Id. at 179.]  According to Todd, Delta "attempted to interview Jake, and he said he had no information to offer." [Id. at 136.]  Todd could not remember which investigation the two interviews were related to, but Todd acknowledged that, between 2010 and 2013, Plaintiff made multiple reports or complaints about being harassed, intimidated, or discriminated against because of her gender.  [Id. at 135-36.]

7

In all of the investigations, HR could not conclude that Plaintiff was sexually harassed or discriminated against, but Todd "believe[d] that [Keller] was coached, on one or more occasions, regarding being difficult, being un-collegial . . . even disrespectful" toward Plaintiff.[9]  [Id. at 142.]

In her summary regarding Plaintiff's complaint about being directed to replace the aircraft toilet, Todd wrote: "The possibility exists that the Station Mgr may have created an environment that is unwelcoming to woman given his some [sic] recent comments he has made to his peers."  [Kupau Decl., Exh. G (Todd Depo.), Exh. 14 (1/10/11 email from Todd to Mindette Fredrikson transmitting summary) at DELTA_000001395, ¶ 5.[10]] Todd confirmed that this referred to Fugere, but she did not have a specific or general recollection of what the comments were.  Todd did not recall the results of any investigation into Fugere's unwelcoming comments, and she did not believe he was suspended.  [Kupau Decl., Exh. G (Todd Depo.) at 184-85.]

---

[9] Keller denied receiving corrective training at the time of the alleged harassment of Plaintiff.  [Kupau Decl., Exh. B (excerpts of trans. of Keller's 9/26/19 depo. ("Keller Depo.")) at 82.]

[10] Fredrikson is Delta's Manager of Equal Opportunity Compliance & Programs.  [Kupau Decl., Exh. G (Todd Decl.), Exh. 19 (email chain from 1/10/11 to 1/13/11 between Todd and Fredrikson regarding Todd's summary regarding Plaintiff's complaint) at DELTA_000001097.]

Fredrikson told Todd that Fugere's "conduct, in his stray comment about Ms. Wadas during the conference call, premature signing off on Ms. Wadas' LQs, and failure to effectively address her performance issues with her need to be addressed with Mr. Fugere." [Kupau Decl., Exh. G, Exh. 19 at DELTA_000001098.] Plaintiff argues Todd's testimony and her summary show that "Delta's HR management knew about [her] mistreatment and Fugere's unwelcoming environment for women." [Pltf.'s CSOF at ¶ 18.]

### 2.   Near-Miss Report

In December 2012, Keller submitted a near-miss report about Plaintiff.[11]  According to Plaintiff, the report arose out of a December 13, 2012 incident when she was attempting to come into the office while her hands were full.  She had seen Keller on the other side of the door, and apparently assumed he saw her.  After she could not open the door with her arm, Plaintiff pushed the door open with her foot.  By that time, Keller had moved behind the door, and the door hit him.  Plaintiff

---

[11] A near-miss report is a report that a mechanic can submit if he or she sees a something that potentially could have caused either injury to a person or damage to an aircraft. [Rand Motion Decl., Exh. G (excerpts of trans. of Curtis Carter's 10/23/19 depo. ("Carter Depo.")) at 39-40.]  According to Plaintiff, a near-miss report was intended to be used for "a pretty serious incident." [Id., Exh. A (Pltf. Depo.) at 151.] Plaintiff argues Keller "misused" the report. [Pltf.'s CSOF at Response ¶ 20.]

apologized and said she did not see him there.  Keller did not respond.  [Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 4 (email chain in December 2012 between Todd, Plaintiff, and Carter) at EEOC000091-92.]  Plaintiff claimed the December 13, 2012 door incident was "not the first time [Keller] blocked the door when [she was] coming in with tools," and she was "emotionally exhausted with the harassment games he play[ed]." [Id. at EEOC000092.]  Plaintiff complained to Carter that: Carter allowed Keller to submit the near-miss report without talking to Plaintiff about the alleged incident first; and Keller did not send her a copy of the email that Keller sent to Carter and another safety representative.  According to Plaintiff, the company protocol required a copy to go to her because she was the Safety Chairperson.  [Id. at EEOC000091-92.] The parties agree that "Carter met with Plaintiff and[,] the following day, Keller sent Plaintiff an e-mail apologizing and explaining he submitted the report to avoid injury and he cared about Plaintiff and wanted to continue to try to get along." [Def.'s CSOF at ¶ 22; Pltf.'s CSOF at Response ¶ 21-24 (stating Defendant's ¶¶ 21 to 24 are "Undisputed").]

### 3.   Reports Regarding Keller Issues

Plaintiff made multiple complaints to Todd, Carter, and Michael Coleman, the regional manager, about Keller and Fugere.  See Pltf.'s CSOF at ¶ 7; see also Kupau Decl., Exh. A

(Pltf. Depo.) at 44, 55, 78-79, 81-83, 98-101, 140-42, 147, 160-61; Kupau Decl., Exh. G (Todd Depo.), Exh. 9 (emails dated 9/16/10 between Todd and Fugere regarding Todd's discussion with Plaintiff about the toilet repair incident); Kupau Decl., Exh. G at 136 (acknowledging that, on multiple occasions from 2010 to 2013, Plaintiff complained about harassment, intimidation, or discrimination based on her gender, and some of these complaints were made directly to Todd), 141 (acknowledging that Plaintiff complained about feeling threatened around Keller and Plaintiff requested that she not be assigned to work with Keller, but Carter decided to deny the request).  When Delta investigated Plaintiff's complaint about Keller's behavior while he was driving her, Keller "admitted that he was, perhaps, being somewhat antagonistic in the drive across the tarmac when he was driving slowly."  [Kupau Decl., Exh. G  at 137-38.]

After Plaintiff's complaint to Todd about Keller requiring her to change the toilet, Todd told Plaintiff "it would not look good for [Plaintiff's] career with Delta if [Plaintiff] made any more allegations against her or against anybody else or if [Plaintiff] made more waves."  [Kupau Decl., Exh. A (Pltf. Depo.) at 101.]  This gave Plaintiff the impression that she "really should not come to [Todd] again," but she apparently continued to do so because that warning from Todd was during her first meeting with Todd.  See id.

11

Plaintiff complained to Fugere and Carter about harassment and intimidation by Keller, but Delta did not take any action and Keller's conduct did not stop.  [Id. at 73, 140-42, 147, 162.]  Carter testified that Plaintiff "may have" said she did not want to work with Keller, but Carter did not have a specific recollection of that.  [Kupau Decl., Exh. E (Carter Depo.) at 60, 63.]  Other mechanics also said Keller "was difficult to work with."  [Id.]  Carter talked to Keller about inappropriate items in Keller's locker, but Carter did not remember what the specific items were, and Carter did not recall if he told Keller to take the items down.  [Id. at 57-58, 60, 63, 73-74.]

Steven Villicana ("Villicana") testified that he experienced disciplinary problems with Keller related to the general issues of time management, teamwork, and the improper use of the showers – including using the men's shower during work hours and using the women's showers.  [Kupau Decl., Exh. D (excerpts of trans. of Steven Villicana's 9/26/19 depo. ("Villicana Depo.")) at 39-41, 48-51.]  He did not remember the specific date when he had to discipline Keller, but it was between 2013 and 2016.  [Id. at 48.]  Villicana also said there were problems with Keller and Korean Airlines ("KAL").  In 2018, Don Chon Myoung Kim ("Kim") complained that Keller refused to finish an aircraft repair because Keller's shift ended.

12

Villicana said they talked to Keller about the incident, but that was not considered a verbal coaching.  Subsequently, Kim also complained that Keller had a bad attitude towards KAL, but Villicana did not conduct a coaching or document the incident. Thus, there is no record of that complaint in Keller's personnel file.  [Id. at 54-57.]

>    **B.    Towing of Plaintiff's Car**

"In June 2011, Plaintiff's car was towed and Plaintiff suggested it was due to her gender, although her parking permit was not in the proper location or visible to the personnel verifying her permission to park in the area."  [Def.'s CSOF at ¶ 16; Pltf.'s CSOF at Response ¶ 16 (disputing Def.'s ¶ 16 only on the ground that the "[c]ited material doesn't support contention Plaintiff suggested towed because of gender").] However, in a June 28, 2011 email disputing whether she should be required to pay for the towing, Plaintiff wrote, "I am so upset that this happened to me.  I understand Delta did not want a female mechanic here, and it has been an extremely hard year and a half, however this is the worst.  It truly makes me feel like an outcast."  [Rand Motion Decl., Exh. F (Carter Depo.), Exh. 10 (emails dated 6/29/11 and 6/28/11 between Carter, Todd, Willard Oshiro, and Faith Furukawa, forwarding emails between Plaintiff and Furukawa) at DELTA_000001141.]

C.   **KAL Incidents**

When Plaintiff came to work for Delta in Honolulu, she did not work exclusively on Delta aircraft.  [Rand Decl., Exh. A (Pltf. Depo.) at 41.]  In February 2013, Steven Villicana, an aircraft mechanic, informed Carter that KAL wanted to speak with him.  Carter subsequently met with Sandy Naito ("Naito"), KAL's Senior Traffic Manager, and Don Kim ("Kim"), a KAL Passenger Service Agent.  Naito and Kim claimed that, when Plaintiff was working on KAL aircraft, she was removing food from the aircraft and eating it.  [Def.'s CSOF at ¶¶ 23-24; Pltf.'s CSOF at Response ¶ 21-24 (stating Def.'s ¶¶ 21-24 are "[u]ndisputed").] In a February 6, 2013 email, Naito summarized some of the things they spoke about earlier that day:

> Last week a Purser . . . had an issue with one of your employees, [Plaintiff].  There was a problem with one of the seats and when the Purser attempted to give her some directions in regards to what needed to be checked, [Plaintiff] raised her voice at the Purser in a confrontational manner. . . .  We have had multiple complaints with this employee for some time now.  Other such incidences include [Plaintiff] opening the fridge on the air craft, taking food and eating on the aircraft.  We have also caught her sitting and reading non related books while she is sitting in the car during working hours. . . .

[Rand Motion Decl., Exh. G (Carter Depo.), Exh. 20 (email chain between Carter and Todd dated 2/6/13 regarding Carter's meeting with Naito) at DELTA_000002096-97.]  However, during her deposition, Naito admitted that she did not personally observe

any of these incidents.  [Kupau Decl., Exh. H (excerpts of trans. of  Naito's 8/20/19 depo. ("Naito Depo.")) at 61-62.]

In a February 7, 2013 email to Carter, Kim wrote:

First of all I would like to start off by saying that Several [sic] times I have seen Delta Maintenance Susan [Wadas] going into our aircraft without being cleared from our inbound flight and goes straight to the catering carts or ovens for food.

Have told her couple of times to not to eat or come on board if the inbound flight is not cleared and wait until one of our Korean Airlines Staff tells everyone that it is cleared for service.

We as in Korean Airlines almost gotten a fine from CSP (Customs and Border Protection) due to Susan being on board when the flight wasn't cleared for service and Customs were on board for inspection.

Luckily, we were just given a warning.  And I have told her to wait until a Korean Air staff tells her that its cleared.  Unless if we have a problem with the inbound aircraft then we will ask the Delta Maintenance to go into the aircraft for inspection.

Secondly, we been having trouble with Delta Maintenance Susan with the relationship with our flight cabin crew.  In example, when cabin crew asks Susan to check on something like AVODs or seat problems and so forth she gives unnecessary attitude to the cabin crews.

Cabin flight Purser comes to me and complains about her handling and attitude situations that's been giving to them.  Sometimes they feel offended by her actions.

So after so many complaints I have received from the cabin crew.  I been watching over her how she was working and her attitude to the crew.

15

> After watching over her for a month I have seen
> good and bad things about her.  But most of the
> time she gives altitude to the cabin crew.
>
> Also, when cabin crew gives friendly advise on
> how to do something's she doesn't listen end gets
> mad easily and refuses to do her job.
>
> Please note that Cabin crew says these stuff only
> to help her out and not that they don't think
> that she doesn't know what she is doing.  But
> majority of the time she does not know how to do
> certain stuff and has to ask other Maintenance on
> how to get the job done.
>
> Thirdly, I would greatly appreciate if she was
> fully trained and certified for our types of
> aircrafts if she is going to continue working for
> Korean Airlines.
>
> I only say this because other Korean Air lines
> staff says the same thing that she doesn't know
> what she is doing.  Sometimes from Susan we get
> asked on how to do things . . . where were just a
> Ground staff.
>
> Please do look into this case seriously, where we
> been on watch for our station due to heavy cabin
> crew complaints regarding Delta Maintenance
> Susan.

[Id., Exh. 22 (email dated 2/8/13 from Carter to Todd forwarding

Kim's email) at DELTA_000000101-02.]  However, Carter told Todd

"[t]he verbal statement [Kim] gave to me was not this strong."

[Id. at DELTA_000000101.]

During his deposition, Kim admitted that some of his

statements in the February 7, 2013 email were not true.  [Kupau

Decl., Exh. C (excerpts of trans. of Kim's 8/20/19 depo. ("Kim

Depo.")) at 65-68.]  He testified that someone from Delta came

to KAL and said there were problems with Plaintiff, but Delta needed "something stronger" against her.  [Id. at 87-88.]  Kim did not remember exactly who from Delta told him that, but he stated it could have been someone both from Hawai`i and someone from the Delta offices on the mainland.  He stated he thought it could have been LaPalm or Carter.  [Id. at 88-89.]  Looking back on the situation, Kim felt that Delta used him and took advantage of him because of his youth – he was twenty-four-years-old at the time of the events in question.  Kim also admitted that he felt guilty about Plaintiff losing her job.  [Id. at 93.]  Plaintiff was present at Kim's deposition, and she states that, after it was over, "Kim approached [her] and apologized for what he had done to [her]."  [Pltf. Decl. at ¶¶ 6, 9.]

The parties agree that: Carter told Plaintiff about the complaint from KAL; she told him she only drank water when it was offered to her; and LaPalm conducted an investigation into the KAL complaint.  [Def.'s CSOF at ¶¶ 27, 29; Pltf.'s CSOF at Response ¶¶ 27, 29.]  The parties also agree that, in the investigation:

> Villicana reported: Plaintiff took and ate food from aircraft, which he spoke to Plaintiff about; Plaintiff argued with KAL's flight attendants; Plaintiff entered KAL aircraft without clearance from Customs; and he told Plaintiff not to read books because it looked bad to KAL and Plaintiff

17

responded, "No one cares but you.  They like me
here."

[Def.'s CSOF at ¶ 32; Pltf.'s CSOF at Response ¶ 32-33.]

Plaintiff submitted a statement, asserting she
drank water and juice on aircraft, but did not
think it was an issue because it was given to
her; KAL told her it did not want passengers to
see her reading, but she would wait for KAL to
depart before reading and would only read
aviation materials; she did not raise her voice
to any flight attendant but set a boundary of the
way a flight attendant could speak to her.

[Def.'s CSOF at ¶ 33; Pltf.'s CSOF at Response ¶ 32-33.]

The parties agree Delta's policy required Villicana to
report that Plaintiff was taking food from KAL, but he did not
do so.  [Pltf.'s CSOF at ¶ 32; Def.'s Concise Statement of Facts
in Reply to the Additional Statements Raised by Pltf. ("Def.'s
Reply CSOF"), filed 7/17/13 (dkt. no. 103), at ¶ 32.]  Villicana
testified that KAL personnel could be demanding and difficult to
work with.  [Kupau Decl., Exh D (Villicana Depo.) at 60.]  They
would make complaints about the Delta mechanics, and some of the
complaints would be valid, but some would not.  [Id. at 136.]

During a question and answer session with LaPalm, Kim
stated Plaintiff accessed an aircraft before it was cleared by
Customs at least ten times, and he saw her take food from an
aircraft approximately every other day.  [Rand Motion Decl.,
Exh. C (excerpts of trans. of LaPalm's 9/25/19 depo. ("LaPalm
Depo.")) at 160-63, Exh. 4 (Question and Answer – Kim Don, dated

18

2/12/13).]  Plaintiff argues Kim's deposition testimony

establishes Kim's statements to LaPalm were also false.

[Pltf.'s CSOF at Response ¶ 31.]

LaPalm was assigned by Coleman, who was LaPalm's

general manager, to conduct the investigation, but LaPalm had

never received formal investigations training.  [Kupau Decl.,

Exh. F (LaPalm Depo.) at 59, 94.]  Prior to this investigation,

LaPalm had only "done a couple" of investigations.  [Id. at

103.]  Todd: provided LaPalm with "e-mail traffic . . . which

[LaPalm] did not have access to"; "introduced [him] to the

people with Delta and Korean Air Lines" that they wanted him to

interview;[12] and provided LaPalm with the questions he was to

ask.[13]  [Id. at 63-64, 81-82.]  Plaintiff argues this was "to

avoid favorable testimony for" Plaintiff.  [Pltf.'s CSOF at

¶ 15.]  LaPalm did not look at Plaintiff's personnel file during

the investigation.[14]  [Kupau Decl., Exh. F (LaPalm Depo.) at

---

[12] Todd testified that she recommended LaPalm not interview
Keller and Pacheco because "they may have a personal bias for or
against her."  [Kupau Decl., Exh. G (Todd Decl.) at 213.]

[13] Todd estimated that, prior to the investigation regarding
Plaintiff, she went through two trainings regarding disciplinary
investigations.  [Kupau Decl., Exh. G (Todd Decl.) at 12-13.]

[14] Plaintiff argues her employment history and personnel
file "contained nothing."  [Pltf.'s CSOF at ¶ 15 (some citations
omitted) (citing Kupau Decl., Exh. G (Todd Decl.) at 247-48,
Exh. 47 (Personnel Files Susan Wadas)).]

102.]  He merely "gathered statements, and did not make any kind of a conclusion" and "[t]urned everything in."  [Id. at 94.] The investigation that ultimately resulted in Plaintiff's termination was concluded in approximately two weeks.  [Id. at 223.]  Plaintiff argues Delta policy required a "'rigorous' investigation and coach[ing of] an employee before discipline." [Pltf.'s CSOF at ¶ 3 (citing Kupau Decl., Exh. E (Carter Depo.) at 105-06, Exh. 1 at Delta000000541).[15]]

During her deposition, Plaintiff testified that she believes KAL discriminated against her because she was a woman. She also testified regarding letters she wrote to Delta personnel documenting incidents of KAL's discrimination.  The incidents involved: KAL staff allegedly disregarding Plaintiff's instructions because she was a woman; disagreements with male and female KAL staff; and KAL staff watching her perform repairs although male mechanics were not watched.  [Rand Decl., Exh. A (Pltf. Depo.) at 202-13, Exh. 6 (letter dated 2/14/13 to Carter, Todd, and LaPalm from Pltf.), Exh. 7 (letter dated 2/16/13 to Todd and LaPalm from Pltf.).]  However, the parties agree that

---

[15] Exhibit 1 is Delta's "The Way We Fly" publication.  It states: "When an employee fails to follow Delta's policies or meet performance requirements, any decision to take disciplinary action or terminate employment is made only after a rigorous process of review and usually only after an employee has received and prior coaching."  [Kupau Decl., Exh. E (Carter Depo.), Exh. 1 at DELTA_000000541.]

Todd ultimately rejected Plaintiff's argument that KAL discriminated against her because of her gender "because Plaintiff could not identify any witness, she claimed KAL had conflicts with both male and female employees at Delta and she never alleged discrimination by KAL prior to being investigated for her own misconduct."  [Def.'s CSOF at ¶ 39; Pltf.'s CSOF at Responsive ¶ 39.]

    Keller testified that he was not part of the investigation which ultimately resulted in Plaintiff's termination.  [Rand Motion Decl., Exh. D (Keller Depo.) at 114.]  During her deposition, Todd testified that Plaintiff disclosed to her in November 2010 that Plaintiff had removed food from aircraft because Plaintiff thought it was wasteful to throw the food away.  Plaintiff said her supervisor expressed concerns and instructed Plaintiff to stop.  Plaintiff asked Todd if the supervisor's instruction was reasonable, and Plaintiff sought Todd's permission to eat the food.  Todd told Plaintiff eating the food was unacceptable if Plaintiff's supervisor said not to eat the food.  Todd admitted that she did not document this conversation with Plaintiff.[16]  Todd testified that removing food

---

[16] Plaintiff emphasizes that there is no evidence of this in her file.  [Pltf.'s CSOF at Response ¶ 38 (citing Todd Depo. at 21:4-25:23).]  While Todd acknowledged that she did not document her discussion with Plaintiff, Todd's testimony does not address whether Plaintiff's supervisor who "coached" Plaintiff about the

(. . . continued)

from an aircraft without permission could be considered theft, and Todd did consider it theft.  Delta considers theft a terminable offense.  [Id., Exh. F (Todd Depo.) at 22-24.] Carter also testified that Delta considered the taking of food to be theft.  [Id., Exh. G (Carter Depo.) at 99, 115-16.] LaPalm testified that taking food from customers or Delta was prohibited and could result in termination.  [Id., Exh. C (LaPalm Depo.) at 114.]  Defendant argues Plaintiff was aware of this policy.  [Def.'s CSOF at ¶ 3 (citing Rand Motion Decl., Exh. A (Pltf. Depo.) at 174 (admitting that, even before working on KAL aircraft, she knew she was not permitted to remove food from an aircraft).]

        The parties agree that, after the investigation, Todd concluded that Plaintiff had removed food from KAL aircraft, and Plaintiff provided false and misleading information.  Todd recommended Plaintiff's termination.  Def.'s CSOF at ¶ 37; Pltf.'s CSOF at Responsive ¶ 37; see also Rand Motion Decl., Exh. F (Todd Depo.), Exh. 41 (Investigative Summary – Susan Wadas – HNL/250, by Todd re KAL complaint received on 2/6/13). The parties also agree that "LaPalm believed KAL's allegations because they were consistent with Villicana's statement and

---

removal of food documented the coaching.  See Rand Motion Decl., Exh. F (Todd Depo.) at 25-26.

LaPalm concluded that Plaintiff lied during the investigation."
[Def.'s CSOF at ¶ 40; Pltf.'s CSOF at Responsive ¶ 40.]

During his deposition, Carter testified that he "had to accept" Plaintiff's termination.  [Rand Motion Decl., Exh. G (Carter Depo.) at 245-46.]  He explained, "I wish we could have kept it in-house.  If we kept it in-house I would have been able to work around it, but what I read was simply too strong for me to keep it in-house.  So it was a difficult decision for me to move it forward."  [Id. at 246.]  Carter ultimately recommended Plaintiff's termination.  [Id. at 257-58, Exh. 35 at DELTA_00000142-43 (memorandum dated 2/22/13 to Michael Coleman from Carter, recommending Plaintiff's termination).]

Plaintiff emphasizes that Todd used Plaintiff's denial that she ate food from KAL aircraft as a basis for termination for providing false and misleading information,[17] and Todd admitted discussing Plaintiff's termination before the investigation was completed.  [Pltf.'s CSOF at ¶¶ 23-24 (citing Kupau Decl., Exh. G (Todd Depo.) at 224-25, Exh. 33 (2/15/13 email chain between Todd, LaPalm, and Coleman regarding

---

[17] Plaintiff emphasizes that she was aware employees were not supposed to remove food from aircraft, but she was not aware Delta considered it theft and that it could result in termination.  She notes that the Delta policy does not specify the offense is terminable.  Pltf.'s CSOF at Response ¶¶ 2-3; see also Kupau Decl., Exh. Q (excerpt of Delta The Way We Fly) at DELTA_000000549.

investigation)).] Todd admitted that, that in her investigation summary, she shortened expanded descriptions of incidents from June 22, 2011 through November 7, 2012. She said it was likely she did so at her supervisor's request to make the document shorter. [Kupau Decl., Exh. G at 233.] The portion Todd shortened included Carter's description of coaching he had done. [Id., Exh. E (Carter Depo.) at 258.] Plaintiff argues "Todd's superior, Barbara Shaw, questioned the breadth of Delta's investigation." [Pltf.'s CSOF at ¶ 25 (citing Kupau Decl., Exh. L).] However, Shaw, the Program Manager, Equal Opportunity, Human Resources merely wrote:

> Can you update the date on the HR RFT; it is
>     before the Ops RFT?
> Do you know why Sandy would not allow Dave to
>     provide a statement?
> Has anyone else complained about her work
>     performance or attitude?
> Have any other mechanics complained about KAL?

[Kupau Decl., Exh. L (2/25/13 email from Shaw to Todd regarding Plaintiff).]

### D.   CRP

Plaintiff asserts she was discriminated against throughout her employment, as well as during the internal appeal process after her termination. [Pltf.'s CSOF at Response ¶ 42 (citing Kupau Decl., Exh. N (email chain on 2/28/13 and 3/1/13 between Todd, Carter, LaPalm, Coleman, and Josh Jessup regarding Plaintiff's participation in the "CRP," *i.e.* Conflict Resolution

24

Process), Exh. O (subsequent emails in the Exh. N chain), Exh. I
(excerpts of trans. of Don Mitacek's 1/30/20 depo. ("Mitacek
Depo.")), Exh. 11 (letter dated 3/9/15 to Plaintiff from Don
Mitacek, Delta's Senior Vice President of Technical Operations,
stating he affirmed Plaintiff's termination, and his decision
concluded the CRP)).[18]]

    The CRP program allows peer review of an employee's
termination. [Kupau Decl., Exh. I (Mitacek Depo.) at 97.]  The
CRP has one process to address actions other than termination
and another process to address terminations. [Kupau Decl.,
Exh. I, Exh. 26 (Conflict Resolution Process Procedures and
Guidelines, Revised 1/1/20 ("CRP Procedures")) at
DELTA_000004734.]  The two processes are the same, except that
that the process for non-termination decisions includes two
additional steps at the beginning of the process. [Id. at
DELTA_000004740, ¶ B(b).]  The CRP Procedures provide that: "To
the extent possible, a request for a Hearing Panel Review will
be heard by the Panel within 20 working days of when the request
is received by the Gatekeeper." [Id. at DELTA_000004738, ¶ 1,
DELTA_000004740, ¶ B(c) (stating that, with exceptions not
applicable here, the procedures described for reviews of non-

---

    [18] None of these sources expressly indicates Plaintiff was
discriminated against.

termination decisions also apply to reviews of termination decisions).]

The parties agree that Plaintiff's CRP hearing was held on February 17, 2015. [Pltf.'s CSOF at ¶ 37; Def.'s CSOF at ¶ 37 (denying Pltf.'s ¶ 37 "as [i]ncomplete" because Plaintiff caused the delay).[19]] The CRP hearing panel consisted of three aircraft mechanics, one management representative, and one HR representative. [Pltf.'s CSOF at ¶ 38; Def.'s CSOF at ¶ 38.] LaPalm presented the case and called Villicana as the only witness, and Plaintiff represented herself. [Pltf.'s CSOF at ¶ 39; Def.'s CSOF at ¶ 39 (denying Pltf.'s ¶ 39, only in part on another point).] The panel voted three to two to modify the termination decision, but, "[b]ecause the majority did not include a vote from the company or HR panelist, the company presenter ha[d] the right to request a step 4 review from the SVP – TechOps." Kupau Decl., Exh. I (Mitacek Depo.), Exh. 12 (2/17/15 email from Becky Camp, CRP Gatekeeper to Mitacek and

---

[19] After Plaintiff's termination, there was disagreement among Delta leadership about whether she was entitled to use the CRP program. See Kupau Decl., Exh. N (email chain dated from 2/28/13 to 3/1/13 between Todd, Coleman, LaPalm, and others), Exh. O (another email chain dated from 2/28/13 to 3/1/13, some of which overlap with Exh. N). Coleman wrote to Todd, "Let's say she wins, what then? This could potentially become a very big mess." [Id., Exh. O at DELTA_000001482 (3/1/13 email from Coleman to Todd).]

others); see also id., Exhs. 23-25 (notes by members of
Plaintiff CRP panel who voted to modify the personnel action).

When the majority does not include a vote from either
the management representative or the HR representative, the
decision is not final, and Mitacek made the final decision.
[Kupau Decl., Exh. I (Mitacek Depo.) at 103.]  At his
deposition, Mitacek admitted he was unaware that: LaPalm only
interviewed Villicana; Todd directed LaPalm to speak to certain
people and not to speak to certain others; and Kim admitted the
statements he provided to LaPalm were false.  [Id. at 58, 61,
74-75.]  Mitacek ultimately affirmed Plaintiff's termination.
[Id., Exh. 11 (letter dated 3/9/15 to Plaintiff from Mitacek).]
In making his decision, Mitacek considered: Plaintiff's failure
to admit stealing food from KAL aircraft; the statements that
LaPalm provided from Kim and Naito; Villicana's statement; and
Mitacek's beliefs that Plaintiff was taking food from the KAL
aircraft and that plaintiff "probably was less than
trustworthy."  [Kupau Decl., Exh. I (Mitacek Depo.) at 110-11.]

## II.  Procedural History

Plaintiff filed a discrimination charge with the
United States Equal Employment Opportunity Commission ("EEOC")
and the Hawai`i Civil Rights Commission ("HCRC") on May 28,
2013.  [Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 9 (EEOC
Notice of Charge of Discrimination, dated 6/4/13, with Decl. of

27

EEOC Charging Party Susan Wadas, submitted to the EEOC and HCRC) at DELTA_000000343.]  The EEOC and the HCRC each issued a right-to-sue letter.  [Rand Removal Decl., Exh. A (Complaint) at ¶ 39; Def.'s Answer to Complaint (Filed June 20, 2018), filed 8/20/18 (dkt. no. 9), at ¶ 39 (admitting that portion of Plaintiff's ¶ 39).]

Plaintiff filed this employment discrimination action in state court on June 20, 2018,[20] and Defendant removed the case to this district court on August 13, 2018, based on federal question jurisdiction and, in the alternative, diversity jurisdiction.  [Notice of Removal, filed 8/13/18 (dkt. no. 1), at ¶¶ 6-7; id., Decl. of Richard M. Rand ("Rand Removal Decl."), Exh. A (Complaint).]  Plaintiff alleges the following claims: discrimination based on gender and sex, consisting of hostile work environment, disparate treatment, and wrongful termination, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, et seq. ("Count I"); retaliation because of her complaints about sex discrimination, in violation of Title VII, 42 U.S.C. § 2000e-3 ("Count II"); discrimination based on gender and sex, consisting of hostile work environment, disparate treatment, and wrongful termination, in violation of Haw. Rev. Stat. § 378-2 ("Count III"); and

---

[20] The instant Motion does not contest the timeliness of this action after the issuance of the right-to-sue letters.

retaliation because of her opposition to sex and gender discrimination, in violation of § 378-2 ("Count IV").  In the instant Motion, Defendant argues it is entitled to summary judgment as to all of Plaintiff's claims.

## DISCUSSION

### I.   Rule 56(d) Request

Plaintiff asks this Court to reserve ruling on the Motion until discovery has been completed.  [Pltf.'s Suppl. at 3.]  Although not expressly stated, Plaintiff appears to request a continuance pursuant to Fed. R. Civ. P. 56(d)(1).

> Under Rule 56(d), a district court may postpone ruling on a summary judgment motion to allow for further discovery where the non-moving party needs "additional discovery to explore facts essential to justify the party's opposition." Jones v. Blanas, 393 F.3d 918, 930 (9th Cir. 2004).[21]  "A party seeking additional discovery under Rule 56(d) must explain what further discovery would reveal that is essential to justify its opposition to the motion for summary judgment." Stevens v. Corelogic, Inc., 899 F.3d 666, 678 (9th Cir. 2018) (internal quotation marks and citation omitted).  "In particular, the requesting party must show that: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." Id. (emphasis in original).
>
> "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that

---

[21] Jones was overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir. 2014).

it would prevent summary judgment." Emp'rs
Teamsters Local Nos. 175 & 505 Pension Trust Fund
v. Clorox Co., 353 F.3d 1125, 1129-30 (9th Cir.
2004) (citation omitted).  A district court may
"deny further discovery if the movant has failed
diligently to pursue discovery in the past, or if
the movant fails to show how the information
sought would preclude summary judgment."  Id. at
1130 (citation omitted).

N.K. Collins, LLC v. William Grant & Sons, Inc., Civ. No. 19-

00386 ACK-RT, 2020 WL 4043976, at *30 (D. Hawai`i July 17,

2020).

Plaintiff identifies the following discovery that she

would like to conduct before the Court rules on the Motion:

obtain responses to her fourth request for production of

documents, served on August 24, 2020 ("Plaintiff's Fourth

RPD");[22] depose Fugere, who was the manager at the time of an

incident involving the alleged theft of a phone; and depose

Coleman, Delta's regional manager "who referenced other

allegations of theft against other Delta employees." [Pltf.'s

Suppl., Decl. of Lanson K. Kupau ("Suppl. Kupau Decl.") at ¶ 6.]

Plaintiff's third request for production of documents, which was

dated October 2, 2019 ("Plaintiff's Third RPD"), asked Defendant

for documents regarding alleged incidents of theft involving

seven specific individuals, as well as any other Delta aircraft

maintenance technician in Honolulu.  Defendant responded to

---

[22] Plaintiff's Fourth RPD is not attached to Plaintiff's
Supplement.

Plaintiff's Third RPD on November 1, 2019.  [Suppl. Kupau Decl., Exh. B (Defendant's response to Plaintiff's Third RPD).]  The discovery sought in Plaintiff's Fourth RPD is substantially similar to the discovery sought in Plaintiff's Third RPD. Compare Suppl. Kupau Decl. at ¶ 6 with Suppl. Kupau Decl., Exh. B at PageID #: 1934.  To the extent that Plaintiff served Plaintiff's Fourth RPD because she believes Defendant did not adequately respond to Plaintiff's Third RPD, Plaintiff could have filed a motion to compel, and she had ample time to file a motion to compel before filing her memorandum in opposition to the instant Motion.  To the extent that Plaintiff seeks additional discovery in Plaintiff's Fourth RPD, it is discovery that she could have sought in Plaintiff's Third RPD.

       According to Plaintiff, the phone incident involved Justin Keller, and she reported it to Delta's lead mechanic in Honolulu, Ken Loeffers, in Fall 2010.  [Pltf.'s Suppl., Decl. of Susan Wadas ("Suppl. Pltf. Decl.") at ¶ 3.]  The parties have already taken Keller's deposition, and Plaintiff's counsel could have asked Keller about the phone incident at that time.  See generally Kupau Decl., Exh. B (Keller Depo.).  Further, Plaintiff's Third RPD sought discovery about alleged theft incidents involving Keller.  See Suppl. Kupau Decl., Exh. B at PageID #: 1929.  Although the parties have not deposed Fugere and Coleman, the fact that they may have information relevant to

this case was known to the parties from the outset of the case. See, e.g., Kupau Decl., Exh. A (Pltf. Depo.) at 44, 55, 78-79, 81-83, 98-101, 140-42, 147, 160-61 (describing the numerous complaints Plaintiff made about Keller and Fugere to Delta management, including Coleman); Rand Motion Decl., Exh. G (Carter Depo.), Exh. 35 at DELTA_00000142-43 (memorandum dated 2/22/13 to Coleman from Carter, recommending Plaintiff's termination). Plaintiff has not explained why Fugere's Coleman's depositions could not have been taken earlier, allowing her to include their testimony within her response to the instant Motion. Even if there are legitimate reasons justifying the failure to take Fugere's and Coleman's depositions prior to this point, Plaintiff has not shown that the information she hopes to obtain during those depositions was not available to her through other discovery methods.

For all of these reasons, this Court finds that Plaintiff has not diligently pursued discovery prior to her request to defer ruling on the Motion pending the completion of discovery. Plaintiff's Rule 56(d) request is therefore denied. The Court now turns to the merits of Defendant's Motion.

## II. Disparate Treatment & Discriminatory Termination

Count I, Plaintiff's Title VII claim, includes allegations of disparate treatment and discriminatory termination. Count III, brought pursuant to Haw. Rev. Stat.

32

§ 378-2, includes the same allegations.  Title VII prohibits employers from, *inter alia*, "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Relevant to Plaintiff's claims alleging she was discriminated against because she is a woman, the language of Haw. Rev. Stat. § 378-2(a)(1)(A) is similar to the language of § 2000e-2(a)(1).

To establish that Defendant violated Title VII, Plaintiff "must first establish a prima facie case of employment discrimination."  See Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir. 2010) (quoting Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007)).  This Court has stated:

> The framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), begins by requiring a plaintiff to establish a prima facie case of discrimination.  The degree of proof required to establish a prima facie case for summary judgment is minimal.  See Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005).  A prima facie case of disparate treatment requires a plaintiff to establish that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position in issue; (3) the plaintiff suffered an adverse employment decision; and (4) one or more employees outside the protected class with comparable qualifications and work records did not suffer similar adverse employment decisions.  See, e.g., White v. Pac. Media Grp., Inc., 322 F. Supp. 2d 1101, 1110 (D. Haw. 2004).

A plaintiff must demonstrate that his or her situation is similar in all material respects to that of employees who received more favorable treatment. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006). However, "a plaintiff is not obligated to show disparate treatment of an **identically** situated employee." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (cited approvingly in Selig). Instead, "individuals are similarly situated when they have similar jobs and display similar conduct." Hawn v. Exec. Jet Mgmt. Inc., 615 F.3d 1151, 1160 (9th Cir. 2010) (citing Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003) (finding employee not similarly situated if he "did not engage in problematic conduct of comparable seriousness" to plaintiff's conduct)).

Under the McDonnell Douglas framework, once a plaintiff succeeds in presenting a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision. Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007). "Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination." Id.

Li v. City & Cty. of Honolulu, CIVIL 14-00573 LEK-RLP, 2017 WL 3015827, at *5-6 (D. Hawai`i July 14, 2017) (emphasis in Li) (some citations omitted).

In interpreting § 378-2, the Hawai`i Supreme Court has looked "to interpretations of analogous federal laws by the federal courts for guidance," and has, in some instances, adopted the same test for a § 378-2 claim as the test used by federal courts for the comparable Title VII claim. See, e.g., Schefke v. Reliable Collection Agency, Ltd., 96 Hawai`i 408,

425-26, 32 P.3d 52, 69-70 (2001) (adopting test for retaliation claim) (citations omitted).  The McDonnell Douglas burden-shifting framework also applies to Haw. Rev. Stat. § 378-2 gender discrimination claims.  See, e.g., Furukawa v. Honolulu Zoological Soc'y, 85 Hawai`i 7, 13, 936 P.2d 643, 649 (1997).

A.   **Termination**

1.   **Prima Facie Case**

Viewing the record in light most favorable to Plaintiff,[23] there is no dispute that: Plaintiff is a member of a protected class; she was qualified to perform her position with Delta;[24] and her termination constitutes an adverse employment decision.  According to Plaintiff, there is at least one male Delta employee - Jeff White ("White"), a Delta mechanic in Honolulu - who was also accused of removing food from an

---

[23] When a district court rules on a motion for summary judgment, the record must be viewed in the light most favorable to the nonmoving party.  Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013).

[24] Curtis Carter's memorandum recommending Plaintiff's termination lists nine instances when Plaintiff received verbal counseling, *i.e.* coaching, and it states Plaintiff's "poor performance/conduct negatively impacts our team and our customers."  [Rand Motion Decl., Exh. G (Carter Depo.), Exh. 35 at DELTA_00000142-43.]  However, the focus of the memorandum is the unauthorized removal of food from KAL aircraft.  Further, viewed in the light most favorable to Plaintiff, the three coaching instances regarding job performance were not serious enough to suggest that Plaintiff lacked the professional qualifications necessary to perform her job.

35

aircraft, but he was not terminated for the alleged theft. [Pltf.'s Suppl. at 2; Suppl. Pltf. Decl. at ¶ 5.[25]]  However, Carter testified that he did not recall any incident between Delta's Sky Chef and White, nor did he recall having any communication with Sky Chef regarding one of Delta's mechanics taking food.  [Suppl. Kupau Decl., Exh. A (Carter Depo.) at 56.] Plaintiff requested discovery from Defendant regarding any alleged theft by White, and Defendant stated it would produce any responsive, non-privileged documents, if there were any. [Id., Exh. B (Def.'s Responses and Objections to Pltf. Susan Wadas' Third Request for Production of Documents) at PageID #: 1930-31.]  Defendant's counsel informed Plaintiff's counsel that Delta did not possess any such documents.  [Suppl. Kupau Decl. at ¶ 5.]

At most, Plaintiff presents her own, self-serving declaration stating White was not fired after being accused of taking food from an aircraft.  See, e.g., Suppl. Pltf. Decl. at ¶ 5. While this Court cannot disregard Plaintiff's statements "solely based on [their] self-serving nature," it can disregard

---

[25] Plaintiff did not have leave to submit the Supplemental Plaintiff Declaration.  See Minute Order, filed 8/17/20 (dkt. no. 111), at 2 (granting Plaintiff leave to supplement the summary judgment record with Curtis Carter's deposition testimony, and any exhibits marked at his deposition regarding the alleged theft by Jeff White).  However, this Court, in the exercise of its discretion, has considered the Supplemental Plaintiff Declaration in ruling on the Motion.

Plaintiff's statements here because the Supplemental Plaintiff Declaration "states only conclusions and not facts that would be admissible evidence."  See Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497 (9th Cir. 2015) (citations omitted).  Because Plaintiff's self-serving statements attempting to show that a similarly situated male employee received more favorable treatment than Plaintiff are disregarded, Plaintiff has failed to present any evidence raising a genuine issue of fact for trial as to the fourth element of her prima facie case - that one more male employees was not terminated for similar misconduct.  See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  Plaintiff has therefore failed to raise a genuine issue of material fact as to her discriminatory termination claims under Title VII and Haw. Rev. Stat. § 378-2.

### 2.   Non-Discriminatory Reason

Even if Plaintiff established that there are triable issues of fact as to her prima facie case, Defendant has shown that it honestly believed it had a legitimate, non-discriminatory reason for Plaintiff's termination.  Delta conducted an investigation into KAL's concern about Plaintiff removing food from KAL aircraft, and ultimately terminated

37

Plaintiff's employment as a result of the investigation.  See,
e.g., Rand Motion Decl., Exh. G (Carter Depo.), Exh. 35 at
DELTA_000000187-89 (Investigative Summary - Susan Wadas -
HNL/250 by Lisa Todd); id. at DELTA_000000142-43 (memorandum
dated 2/22/13 to Coleman from Carter recommending Plaintiff's
termination); id. at DELTA_000000160 (memorandum dated 2/22/13
to Josh Jessup, Manager - Human Resources, from Todd,
recommending that Plaintiff be asked to resign, and that her
employment be terminated if she refused).

        It not necessary for this Court to determine whether
Delta's reason for Plaintiff's termination was "**objectively**
false"; this Court need only determine whether Delta "honestly
believed its reason for its actions, even if its reason [wa]s
foolish or trivial or even baseless." See Villiarimo v. Aloha
Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis
in Villiarimo) (citation and internal quotation marks omitted).
Carter testified that he wished the situation could have been
kept within Delta's Honolulu office and that it could have been
handled differently.  [Rand Motion Decl., Exh. G (Carter Depo.)
at 246.]  This, however, does not show that Delta lacked an
honest belief in its reason for Plaintiff's termination.
Although expressing some regrets, Carter also acknowledged that
the evidence presented to him was too strong for the matter to
be dealt with in the Honolulu office.  [Id.]  Carter did move

the matter beyond the Honolulu office, and Mitacek ultimately
affirmed Plaintiff's termination after the CRP process.  [Kupau
Decl., Exh. I (Mitacek Depo.), Exh. 11 (letter dated 3/9/15 to
Plaintiff from Mitacek).]

   Even viewing the record in the light most favorable to
Plaintiff, Defendant has carried its burden to establish that it
honestly believed it had a legitimate, non-discriminatory reason
for Plaintiff's termination.  The burden therefore shifts back
to Plaintiff to raise a genuine issue of fact as to pretext.
See Noyes, 488 F.3d at 1168.

   **3.**  **Pretext**

   Plaintiff argues the following evidence raises a
triable issue of fact as to pretext: Carter's termination
recommendation cited poor performance, even though her personnel
file does not contain any evidence of poor performance
evaluations; Delta's investigation into KAL's allegations was
not rigorous enough; Delta attempted to deprive her of the use
of the CRP program; and Kim admitted Delta personnel encouraged
him to lie in his statements about Plaintiff.

> A plaintiff asserting . . . discrimination can
> "demonstrate pretext in either of two ways:
> (1) directly, by showing that unlawful
> discrimination more likely than not motivated the
> employer; or (2) indirectly, by showing that the
> employer's proffered explanation is unworthy of
> credence because it is internally inconsistent or
> otherwise not believable." Earl v. Nielsen Media
> Research, Inc., 658 F.3d 1108, 1112-13 (9th Cir.

> 2011). . . .  When the plaintiff has some direct
> evidence but also must rely on circumstantial
> evidence to show pretext, we treat direct and
> circumstantial evidence alike, Desert Palace,
> Inc. v. Costa, 539 U.S. 90, 100, 123 S. Ct. 2148,
> 156 L. Ed. 2d 84 (2003), and we consider both
> types of evidence cumulatively, Raad v. Fairbanks
> N. Star Borough Sch. Dist., 323 F.3d 1185, 1194
> (9th Cir. 2003).

France v. Johnson, 795 F.3d 1170, 1175 (9th Cir. 2015), *as
amended on reh'g* (Oct. 14, 2015).

As previously noted, Carter's recommendation that
Plaintiff be terminated cited nine prior instances of verbal
counseling, but only three were performance related.  [Rand
Motion Decl., Exh. G (Carter Depo.), Exh. 35 at DELTA_00000142-
43.]  Plaintiff argues the fact that those counseling instances
were included in the recommendation is evidence of pretext
because there is no evidence in her personnel records of prior
performance issues.  See Kupau Decl., Exh. G (Todd Depo.),
Exh. 47 (documents from Plaintiff's personnel file).  However,
even accepting Plaintiff's position that the prior counseling
sessions were not documented in her personnel records prior to
the February 22, 2013 memorandum recommending Plaintiff's
termination, the lack of documentation is not evidence of
pretext.

One of Delta's employee policy manuals stated:

> When an employee fails to follow Delta's policies
> or meet performance requirements, any decision to
> take disciplinary action or terminate employment

40

> is made only after a rigorous process of review
> and usually after an employee has received prior
> coaching.  Of course, in some situations, the
> behavior or policy violation may be so serious
> that it, in and of itself, may warrant review for
> termination.

[Id., Exh. E (Carter Depo.) Exh. 1 (Delta The Way We Fly) at

DELTA_000000541.]  Todd and Carter both testified that the

unauthorized taking of food from an aircraft was considered

theft.  [Rand Motion Decl., Exh. F (Todd Depo.) at 22-24.; id.,

Exh. G (Carter Depo.) at 99, 115-16.]  Under Delta's policy,

this could be considered behavior that was so serious it

warranted consideration for termination, even without prior

coaching.

     The three performance-related counseling sessions

noted in the February 22, 2013 memorandum related to:

"Cleanliness of work area"; "Failure to sign fuel slips"; and

"Filling O2 bottles."  [Rand Motion Decl., Exh. G (Carter

Depo.), Exh. 35 at DELTA_000000142.]  These are unrelated to the

food-theft allegation that triggered the investigation which

ultimately resulted in Plaintiff's termination.  Further, the

performance-related counseling sessions do not appear to be

related to each other, and they apparently did not warrant

further action beyond the counseling sessions.  Thus, neither

the fact that Plaintiff was apparently never coached for

removing food from an aircraft nor the fact that her three prior

41

performance-related coaching sessions do not appear in her personnel record raises a triable issue of fact as to pretext.

Plaintiff argues her Exhibits N and O show that Delta attempted to preclude her from using the CRP process, and this is evidence of pretext. In one of the email messages contained within Exhibit N, Michael Coleman asks whether the fact that Plaintiff was terminated for theft precluded her from using the CRP program. [Kupau Decl., Exh. N at DELTA_000001363 (email dated 3/1/13 from Coleman to Todd).] Todd responded that use of the CRP program would be precluded under some circumstances, but Todd stated that, because there had been two other similar cases - one involving the theft of gas - where the use of the CRP program had been allowed, Delta "need[ed] to ensure [it did not] treat [Plaintiff] any differently." [Id. (email dated 3/1/13 from Todd to Coleman).] Coleman also expressed additional doubts about Plaintiff's use of the CRP program. [Id. (second email dated 3/1/13 from Coleman to Todd); Kupau Decl., Exh. O at DELTA_000001482 (email from Coleman to Lee Gossett).[26]] However, those doubts were clearly resolved in Plaintiff's favor, as it is undisputed that she did go through the CRP program. In light

---

[26] The date of this email message appears to have been deleted from the exhibit. However, because it appears in an email chain between two emails dated March 1, 2013, it is likely the undated email was also written on that date. [Kupau Decl., Exh. O at DELTA_000001482.]

of Todd's statements and the fact that Plaintiff did ultimately
utilize the CRP program, Coleman's statements questioning the
availability of the program do not raise a triable issue of fact
as to pretext.

Plaintiff next argues the lack of a rigorous
investigation into KAL's allegations shows that Delta's reason
for terminating her was pretextual.  Plaintiff argues LaPalm
lacked sufficient training in the conduct of disciplinary
investigations, and Plaintiff criticizes the investigation
itself, including the decisions about who to interview and what
questions to ask.  However, Plaintiff has offered no evidence
suggesting that a more rigorous investigation was conducted by
Delta when the subject of the investigation was a male.  Thus,
Plaintiff's criticisms of the investigation do not raise a
genuine issue of fact for trial as to pretext.  Even if there
were defects in the investigation, the defects alone would be
insufficient to raise a genuine issue of fact as to the question
of whether the stated reasons for Plaintiff's termination were
merely pretext.  See Villiarimo, 281 F.3d at 1063 (stating
courts "only require that an employer honestly believed its
reason for its actions, even if its reason is . . . baseless"
(citation and internal quotation marks omitted)).

Finally, Plaintiff asserts Kim admitted during his
deposition "that he lied about [Plaintiff] at the encouragement

of Delta" and this, at a minimum, raises a genuine issue of fact as to pretext. [Mem. in opp. at 19 (citing Kupau Decl., Exh. C (Kim Depo.) at 65:11-68:25; 84:1-15; 85:13-24; 87:14-89:22; 93:1-15).] Kim did admit that some of the statements in his February 7, 2013 email were not correct. [Kupau Decl., Exh. C at 65-68.] However, later during the deposition, he clarified that what was incorrect was the statement that he personally saw the incidents described in the email. The incidents described in the email were based on information he obtained from other people. Def.'s Reply CSOF, Decl. of Richard M. Rand ("Rand Reply Decl."), Exh. H (Kim Depo.) at 108, 110; see also id. at 58-59 (stating he did not personally observe the incident between Plaintiff and a purser); id. at 96 (stating the information in the email was "information that we gathered all together, not just myself"). Further, to the extent that some of Kim's prior statements were false, he testified that he did not tell LaPalm any of his statements were false. [Rand Reply Decl., Exh. H at 99.] Thus, even viewing the record in the light most favorable to Plaintiff, Kim's admission of falsehoods does not call into question Defendant's honest belief in its reason for terminating Plaintiff.

Plaintiff also argues Kim admitted in his testimony that someone from Delta encouraged him to make false statements about Plaintiff. However, Plaintiff misconstrues Kim's

testimony.  He stated someone from Delta - who Kim did not remember, but who may have been LaPalm or Carter - told Kim and others at KAL "there's problems with" Plaintiff and that Delta "need[ed] something stronger."  [Id. at 87-89.]  According to Kim, the unidentified person did not say why Delta needed something stronger, and the person did not indicate that Delta would fire Plaintiff if it had something stronger.  [Id. at 88.] Kim responded to a question from Plaintiff's counsel as follows:

> Q    You either did this by yourself and provided all of these false statements and lied [sic] that cost her job, or somebody encouraged you to provide that false information that cost her her job.  Which one is it, you or someone from Delta?
>
> A    All I can say was I wouldn't' do that on my own.
>
> Q    So that means it was someone form Delta?
>
> A    Yes.

[Id. at 89.]  Kim also stated he felt that, "[i]n a way," "Delta used [him] to fire her."  [Id. at 93.]  However, in response to questions by Defendant's counsel, Kim did not state that someone from Delta told him to lie.

> Q    Because I'm trying to -- this -- you don't remember somebody from Delta telling you to lie, do you?
>
> A    I don't know.  They could just be saying, okay, you know what, tell me do this, but I don't know if they're telling me to lie or . . .

> Q     I think you said they said they needed
> something stronger.   Do you recall that?
>
> A     (Witness nods head.)

[Id. at 95-96.]  Ultimately, the only specific statement that

Kim attributed to someone from Delta was the need for "something

stronger" about Plaintiff - a statement that likely referred to

a need for more evidence or more specific information.  The

statement was not necessarily an encouragement to lie.  Even

viewing the record in the light most favorable to Plaintiff,

that statement does not raise a genuine issue of fact as to

pretext.  Thus, Plaintiff has failed to identify any evidence

which raises a genuine issue of fact as to pretext.

### 4.   Ruling

Defendant is entitled to summary judgment as to

Plaintiff's discriminatory termination claims under both

Title VII and Haw. Rev. Stat. § 378-2 because she has not raised

a genuine issue of fact for trial as to her prima facie case.

Further, even if there is a triable issue of fact as to

Plaintiff's prima facie case, Defendant has shown that it

honestly believed it had a legitimate, nondiscriminatory reason

for its decision to terminate Plaintiff's employment, and

Plaintiff has not identified any evidence that raises a genuine

issue of fact as to pretext.  The Motion is therefore granted as

to Plaintiff's discriminatory termination claims in Counts I and II.

**B.   <u>Other Allegedly Discriminatory Actions</u>**

Plaintiff's Complaint alleges her termination was the culmination of multiple adverse employment decisions based on her sex. <u>See</u> Complaint at ¶ 43 ("Defendant's illegal actions against Plaintiff were aimed at Plaintiff because of her sex, resulting in adverse impacts to the terms and conditions of Plaintiff's employment, and further, subjecting Plaintiff to . . . disparate treatment, ultimately, resulting in her wrongful termination."); <u>id.</u> at ¶ 50 (same).  In her memorandum in opposition to the Motion, Plaintiff discusses:

-Fugere's inappropriate attitude toward female employees-, including Plaintiff; <u>see</u> Kupau Decl., Exh. R (January 2011 email chain in which Fugere discusses Plaintiff); <u>id.</u>, Exh. G (Todd Decl.) at 184-85 & Exh. 14 (1/10/11 email from Todd transmitting summary of Plaintiff's sex-discrimination claim);

-an incident when Keller was directed to remove an inappropriate image from his locker, and Keller's antagonism toward her; <u>see</u> Kupau Decl., Exh. G at 138, 141; <u>id.</u>, Exh. A (Pltf. Depo.) at 44, 55-57, 60, 72 78-79, 81-83, 98-100, 134-36, 156-57, 220;

-Pacheco's statement to Delta HR that he thought Plaintiff was experiencing sex discrimination; <u>see</u> Kupau Decl., Exh. G at 136-37; and

-the lack of action taken against Villicana after Delta learned that he violated Delta policy by failing to report Plaintiff for removing food from KAL aircraft, <u>see</u> <u>id.</u> at 117-18, 20; Kupau Decl., Exh. F (LaPalm Depo.) at 114-115, 233.

However, Plaintiff discusses these items in the context of the fourth element of her prima facie case for her discriminatory termination claims - whether similarly situated male employees were treated more favorably.  [Mem. in opp. at 17-18.] Plaintiff does not contend any of these constitute adverse employment actions that are separate instances of disparate treatment.  Thus, to the extent that Counts I and III allege disparate treatment claims based on discriminatory treatment other than Plaintiff's termination, Plaintiff has abandoned those portions of Counts I and III, and Defendant is entitled to summary judgment.

## III. Hostile Work Environment

Counts I and III also allege hostile work environment claims under Title VII and § 378-2, respectively.

### A. Timeliness

Because Plaintiff's discrimination charge was dual-filed with the EEOC and the HCRC, see Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 9 (EEOC Notice of Charge of Discrimination) at DELTA_000000343, the 300-day limitation period applies to her Title VII hostile work environment claim.  See 42 U.S.C. § 2000e-5(e)(1).  The 180-day limitation period in Haw. Rev. Stat. § 368-11(c) applies to Plaintiff's hostile work environment claim under § 378-2.  See Beckmann v. Ito, 430 F. Supp. 3d 655, 672 (D. Hawai`i 2020).  The EEOC received

Plaintiff's discrimination charge on May 28, 2013. [Rand Motion Decl., Exh. A, Exh. 9 at DELTA_000000343.]

Keller's submission of a near-miss report arising from an incident on December 13, 2012 is within both the 300-day period and the 180-day period. See Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 4 (email chain in December 2012 between Todd, Plaintiff, and Carter discussing the near-miss report) at EEOC000091-92. The other incidents that Plaintiff relies upon are outside of both limitation periods. See supra Background Sections I.A.1 and B. Plaintiff's position is that all of the acts at issue are part of a continuing violation.

> The Supreme Court analyzed the continuing violation doctrine as it relates to employment discrimination practices in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). The Supreme Court distinguished discrete discriminatory acts from hostile work environment claims. "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 113. According to the Court, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113.

> In contrast, the "very nature" of hostile work environment claims "involves repeated conduct." Id. at 115. The unlawful practice "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. To determine whether a hostile work environment exists, the court may look to all the circumstances, including "component acts of the hostile work environment [that] fall outside the statutory time period." Id. at 116-

> 17.   "Provided that an act contributing to the
> claim occurs within the filing period, the entire
> time period of the hostile environment may be
> considered by a court for the purposes of
> determining liability."  <u>Id.</u> at 117; <u>see also</u>
> <u>Cherosky v. Henderson</u>, 330 F.3d 1243, 1246 (9th
> Cir. 2003) ("<u>Morgan</u> makes clear that claims based
> on discrete acts are only timely where such acts
> occurred within the limitations period, and that
> claims based on a hostile environment are only
> timely where at least one act occurred during the
> limitations period.").

<u>Beckmann</u>, 430 F. Supp. 3d at 673 (alteration in <u>Beckmann</u>)

(footnote omitted).

> Interpreting <u>Morgan</u>, the Ninth Circuit has
> held that courts must uphold "the dichotomy
> between discrete acts and a hostile environment"
> by requiring a timely non-discrete act in order
> to maintain a hostile work environment claim.
> <u>Porter [v. Cal. Dep't of Corr.]</u>, 419 F.3d [885,]
> 893 [(9th Cir. 2005)].  "If the plaintiff
> adequately alleges a timely non-discrete act,
> then he may be able to bring in other untimely
> non-discrete acts to establish a hostile work
> environment claim."  <u>Montoya v. Regents of Univ.</u>
> <u>of Cal.</u>, No. 09CV1279-MMA (JMA), 2010 WL 2731767,
> at *7 (S.D. Cal. July 9, 2010) (citing <u>Porter</u>,
> 419 F.3d at 893); <u>see also Yonemoto v. Shinseki</u>,
> 3 F. Supp. 3d 827, 845 n.10 (D. Haw. 2014)
> (raising in a footnote that although "this court
> is bound by <u>Porter</u>," "<u>Porter</u> has been criticized
> to the extent it suggests that a hostile work
> environment claim must be based solely on non-
> discrete acts").

> Since <u>Porter</u>, however, the Supreme Court has
> characterized its own holding in <u>Morgan</u>:

> > The analysis for the limitations period
> > turns on the nature of the specific legal
> > claim at issue.  In <u>Morgan</u>, the Court noted
> > that even if a claim of discrimination based
> > on a single discriminatory act is time
> > barred, **that same act** could still be used as

> part of the basis for a hostile-work-
> environment claim, so long as one other act
> that was part of that same hostile-work-
> environment claim occurred within the
> limitations period.
>
> Green v. Brennan, --- U.S. ----, 136 S. Ct. 1769,
> 1781 n.7, 195 L. Ed. 2d 44 (2016) (emphasis
> added); see also id. at 1778 (citing Morgan as
> "holding that a hostile-work-environment claim is
> a single 'unlawful employment practice' that
> includes every act composing that claim, whether
> those acts are independently actionable or not").
> This Court defers to the Supreme Court's
> description of its holding in Morgan.  Because a
> discrete act may be used to support a hostile
> work environment claim, the continuing violation
> doctrine permits a court to rely on the timely
> discrete act in order to consider other untimely
> acts that make up the same single unlawful
> employment practice.

Id. at 674-75 (emphasis in Beckmann).  Termination is a discrete

act.  Id. at 674 (citing Morgan, 536 U.S. at 110, 114, 122 S.

Ct. 2061).  Although Plaintiff's termination occurred within the

relevant limitations periods, it cannot be the timely event in a

continuing violation because this Court has ruled that Plaintiff

failed to raise a genuine issue of material fact as to her claim

that her termination constituted gender discrimination.  In

order for Plaintiff to establish a continuing violation for

purposes of her hostile work environment claims, she must

establish that Keller's submission of the December 2012 near-

miss report was a non-discrete, discriminatory act.

51

B.    **Whether the Near-Miss Report Was a Discriminatory Act**

The Ninth Circuit has stated:

A plaintiff may establish a sex hostile work
environment claim by showing that he was
subjected to verbal or physical harassment that
was sexual in nature, that the harassment was
unwelcome and that the harassment was
sufficiently severe or pervasive to alter the
conditions of the plaintiff's employment and
create an abusive work environment.  See Gregory
v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).
A plaintiff must establish that the conduct at
issue was both objectively and subjectively
offensive: he must show that a reasonable person
would find the work environment to be "hostile or
abusive," and that he in fact did perceive it to
be so.  Faragher v. City of Boca Raton, 524 U.S.
775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662
(1998).  Where an employee is allegedly harassed
by co-workers, the employer may be liable if it
knows or should know of the harassment but fails
to take steps "reasonably calculated to end the
harassment."  Nichols [v. Azteca Rest. Enter.,
Inc.], 256 F.3d [864,] 875 [(9th Cir. 2001)]
(internal quotation marks omitted).

Dawson v. Entek Int'l, 630 F.3d 928, 937–38 (9th Cir. 2011).

The requirements to establish a hostile work environment claim

under Hawai`i law are similar, with some exceptions.  See

Arquero v. Hilton Hawaiian Vill. LLC, 104 Hawai`i 423, 431, 91

P.3d 505, 513 (2004) ("This court also requires conduct to be

'severe and pervasive' to constitute actionable sexual

harassment.  However, in contrast to federal courts, this

court's analysis of whether particular **harassing conduct** was

'severe and pervasive' is separate and distinct from the

remaining requirements of a plaintiff's claim: it is the

harasser's conduct which must be severe or pervasive, not its effect on the plaintiff or on the work environment." (emphasis in Arquero) (citations and internal quotation marks omitted)).

The record clearly shows that there were conflicts between Plaintiff and Keller.  Todd acknowledged that Keller "was coached, on one or more occasions, regarding being difficult, being un-collegial, being, perhaps, even disrespectful" to Plaintiff. [Rand Motion Decl., Exh. F (Todd Depo.) at 142).]  However, the other Delta mechanics – who were male – also had problems with Keller.  Carter testified that, at some point in 2012 or 2013, Carter

> had spoken to Justin Keller about his conduct
> with -- with individual mechanics.  Every -- a
> lot of mechanics had, uh, uh, mentioned that his
> personality was very abrasive.  Uh, and I
> remember talking to him, coaching him about, uh -
> - about it a few times, because the incident I
> recall is I stated, "If we have these
> conversations again, it's, uh -- it will go to,
> uh, an HR plead and, uh, a warning."  It's was
> [sic] going to go to paper.

[Id., Exh. G (Carter Depo.) at 58.]  Other mechanics also complained about Keller's attitude, and Carter stated that, because of Keller's "demeanor," Keller could be "a very difficult person to understand." [Id. at 59.]  However, the other mechanics never complained that the issues with Keller made him difficult to work with. [Id. at 84-85.]  Similarly, Villicana acknowledged that Keller's attitude occasionally

caused friction with others in their station, and Villicana agreed that Keller "simply rub[bed] people the wrong way[.]" [Rand Motion Decl., Exh. E (Villicana Depo.) at 49.]

After Plaintiff submitted an internal complaint about Keller's submission of the December 2012 near-miss report, Todd stated the incident "[s]eem[ed] like an issue of common courtesy on [Keller]'s part" that merely required Plaintiff "to assert [her]self with him . . . by asking him to step aside or asking him to help [her] with the door." [Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 4 at EEOC000091 (12/26/12 email from Todd to Plaintiff and Carter).] Even construing the record in the light most favorable to Plaintiff, Keller's submission of the near-miss report in December 2012 was the result of personal conflict, not a discriminatory act motivated by Plaintiff's gender. Thus, it does not constitute a timely, non-discrete act of discrimination for purposes of a hostile work environment claim. See Faragher, 524 U.S. at 788 (stating the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code" (citation and internal quotation marks omitted)).

Because the December 2012 near-miss report was not a non-discrete act of gender discrimination, Plaintiff cannot establish a continuing violation. In light of the failure of Plaintiff's continuing violation argument, her hostile work

54

environment claim under Title VII is untimely.  For the same reasons, Plaintiff's hostile work environment claim under § 378-2 is also untimely.  Defendant is therefore entitled to summary judgment as to Plaintiff's hostile work environment claims in Counts I and III.

## IV.  <u>Retaliation</u>

Count II alleges a retaliation claim under Title VII, and Count IV alleges a retaliation claim under § 378-2.  Under Title VII, it is unlawful for an employer to retaliate against an employee who has asserted his or her rights under Title VII.  <u>See</u> 42 U.S.C. § 2000e-3(a).  To make a prima facie case for a retaliation claim under Title VII, a plaintiff must show that "(1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."  <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1093-94 (9th Cir. 2008) (citation omitted).  The degree of proof necessary to oppose a motion for summary judgment by establishing a prima facie case of retaliation is "minimal."  <u>See</u> <u>Cordovo v. State Farm Ins. Cos.</u>, 124 F.3d 1145, 1148 (9th Cir. 1997) (citations and quotation marks omitted).

> Protected activity includes the filing of a
> charge or a complaint, or providing testimony
> regarding an employer's alleged unlawful
> practices, as well as engaging in other activity
> intended to "oppose[]" an employer's

discriminatory practices.  42 U.S.C. § 2000e-3(a).  "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'"  Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000) (quoting Yartzoff v. Thomas, 809 F.2d 1371, 1371 (9th Cir. 1987)).  In addition, the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity.  See Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).

Raad, 323 F.3d at 1197 (alteration in Raad).  As to the third element, a plaintiff must show that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).  In other words, a plaintiff must show that his protected activity was "a but-for cause" of the adverse employment action.  Id. at 362.

Once the plaintiff has made her prima facie case of retaliation, the burden shifts to the defendant to establish a nondiscriminatory reason for its decision under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis.  See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).  The requirements to establish a retaliation claim under § 378-2 are similar.  See Wunderlin v. AB Car Rental Servs., Inc., CIVIL NO. 17-00392 JAO-KSC, 2018 WL 5087222, at *10-11 (D. Hawai`i Oct. 18, 2018).

56

In this case, it is undisputed that Plaintiff engaged in protected activity by making multiple internal complaints about sex/gender discrimination, and Plaintiff's termination is an adverse employment action.  Thus, the issue before this Court is whether Plaintiff has raised a genuine issue of fact for trial as to the issue of causation.  When a protected act is sufficiently close in time to the adverse employment action, it can support an inference of causation.  See Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision." (citation and internal quotation marks omitted)).  However, the only protected activity that was sufficiently close to Plaintiff's termination to support an inference of causation is her internal complaint about Keller's December 2012 near-miss report.  See Rand Motion Decl., Exh. A (Pltf. Depo.), Exh. 4 (email dated 12/21/12 from Plaintiff to Carter and Todd regarding Keller's near-miss report).  The complaints that Plaintiff made after she was already under investigation for allegedly removing food from KAL aircraft cannot support her retaliation claim because those complaints could not have been the cause of the KAL complaint which triggered the investigation.

57

However, as discussed in the context of Plaintiff's discriminatory termination claims, Defendant has established that it honestly believed it had a legitimate, non-discriminatory reason for Plaintiff's termination. Plaintiff has not identified sufficient evidence to raise a genuine issue of fact as to whether the stated reason was merely pretext for retaliation. Plaintiff has failed to raise a genuine issue of fact for trial as to her claim that her termination was in retaliation for her complaint about Keller's December 2012 near-miss report.

Incidents that are further removed in time may still support an inference of causation when combined with other evidence of retaliatory intent. See, e.g., Archuleta v. Corr. Corp. of Am., 735 F. App'x 238, 241 (9th Cir. 2018) (noting that, in Allen v. Iranon, 283 F.3d 1070, 1078 (9th Cir. 2002), "an 11-month gap was held to support an inference of retaliation, but the temporal proximity was not the only evidence to support retaliatory intent"). However, some of Plaintiff's protected activities are too far removed from her termination for this inference to apply. See, e.g., Rand Motion Decl., Exh. F (Todd Depo.), Exh. 15 at DELA_000001118-20 (letter dated 1/2/11 to Todd from Plaintiff regarding toilet-repair incident). As to Plaintiff's protected activities that were sufficiently close to her termination to support an inference of

causation if accompanied by other evidence of retaliatory intent, Plaintiff has not identified any other evidence of retaliatory intent.

Because Plaintiff has failed to raise a triable issue of fact as to her retaliation claims, Defendant is entitled to summary judgment as to Counts II and IV.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment, filed on January 22, 2020 and renewed on June 22, 2020, is HEREBY GRANTED, and summary judgment is granted in favor of Defendant as to all of Plaintiff's claims in this case. The Clerk's Office is DIRECTED to enter judgment in favor of Defendant on **January 12, 2021**, unless Plaintiff files a timely motion for reconsideration of this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 28, 2020.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

<u>SUSAN WADAS VS. DELTA AIR LINES, INC.;</u> CV 18-00312 LEK-KJM; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT